# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| SUZANNE ALESHIRE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 08 CV 7367 |
| v. | ) | Judge St. Eve |
| | ) | Magistrate Ashman |
| | ) | |
| HARRIS, N.A., | ) | JURY DEMANDED |
| | ) | |
| Defendant. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiff, SUZANNE ALESHIRE, by and through her attorneys, Belongia, Shapiro & Hynes, LLP, complains against Defendant, HARRIS, N.A., as follows:

## PARTIES

1.     At all relevant times, Plaintiff SUZANNE ALESHIRE (hereinafter "Aleshire") was a resident of the Village of Winnetka, County of Cook, and State of Illinois.

2.     Aleshire is in the business of acquiring real property; rehabbing and performing certain construction to said real property; and then leasing said real property. Aleshire had been successfully conducting this business for approximately thirty-one (31) years, up to the time of the unlawful conduct of Defendant as further described herein. Aleshire alleges that it is this unlawful conduct which has caused the condition of her now current negative financial condition.

3.     At all relevant times, Defendant HARRIS, N.A., (hereinafter the "Bank" or "Defendant"), was a federally chartered bank and maintained a principal office at 111 W. Monroe Street, City of Chicago, County of Cook, and State of Illinois.

## JURISDICTION AND VENUE

4.      Federal question jurisdiction exists under 28 U.S.C. 1331 because Plaintiff asserts a claim under a federal statute.  Jurisdiction also exists under 15 U.S.C. 1681p.

5.      Venue in this district is proper pursuant to 28 U.S.C. 1391(b), as the acts and transactions that give rise to this case occurred in the district, and because Defendant can be found, has agents and transacts substantial business within the district.

## GENERAL FACTUAL ALLEGATIONS

6.      Aleshire was a customer of Villa Park Bank for several years prior to December 2005 and enjoyed excellent service from this bank and also had an excellent credit score during this same time period.

7.      On or about December 5, 2005, Villa Park Bank was acquired by Defendant.

8.      Prior to December 5, 2005, Aleshire had five (5) separate loans originated with Villa Park Bank, which Defendant then acquired and upon information and belief became an assignee through acquisition.  These five loans had principal amounts which totaled $3,840,000, and are specifically listed as follows:

      a.      Loan number 301080252 is an interest only loan with the principal amount of $2,000,000, at a five (5) year fixed interest rate of 4.99 percent (hereinafter "Loan A").

      b.      Loan number 301080222 is an interest only loan with the principal amount of $400,000, at a five (5) year fixed interest rate of 5.49 percent (hereinafter "Loan B").

      c.      Loan number 301080653 is an interest only loan with the principal amount of $165,000, at a five (5) year fixed interest rate of 7.19 percent (hereinafter "Loan C").

d.  Loan number 301080270 is an interest only loan with the principal amount of $600,000, at a five (5) year fixed interest rate of 5.49 percent (hereinafter "Loan D").

e.  Loan number 301080271 is an interest only loan with the principal amount of $675,000, at a five (5) year fixed interest rate of 5.49 percent (hereinafter "Loan E" and collectively the "Loans").

9.  Prior to December 5, 2005, the Loans were correctly reported on Aleshire's consumer credit report by the credit reporting bureaus as follows: Loan A in an amount of $2,018,274.27; Loan B in an amount of $403,728.85; Loan C in an amount of $167,238.85; Loan D in an amount of $606,727.87; and Loan E in an amount of $682,568.85.

10.  After December 5, 2005, and only after Defendant acquired the Loans, the credit reporting which appeared on Aleshire's consumer credit report as reported by Defendant to the national consumer credit reporting agencies was incorrect.

11.  After December 5, 2005, Defendant began reporting the Loans twice or double-reporting the Loans with the national consumer credit reporting agencies. Therefore, Aleshire's consumer credit report was reflecting each of the Loans twice: once as Villa Park Bank loans and once as loans with Defendant. This false reporting gave potential third party lenders and other issuers of consumer credit incorrect information that Aleshire had more than double the amount of credit liability to Defendant than she actually did.

12.  Defendant also incorrectly reported the total owed amount of Loan A as $9,999,999, which equates to an "unlimited" line of credit. Loan A was not an "unlimited" line of credit with Defendant. Rather, the mortgage securing Loan A specifically states a maximum mortgage lien amount of $2,000,000.

13.     Loan A was also double-reported in the aforementioned amount.  Therefore Aleshire's consumer credit report gives the appearance that she had a liability on Loan A in the amount of $19,999,998 or an amount almost $18,000,000 higher than should be reported.

14.     Additionally, Defendant began reporting incorrect amounts for all of the rest of the Loans as well.  Defendant began reporting to the national consumer credit reporting agencies the total payoff amount, including interest, as the amount owed instead of the actual outstanding loan principal.  This false reporting gave the impression that Aleshire was over the credit limit for each of the five (5) Loans.

15.     Defendant erroneously reported each of the Loans as over the credit limit available for Aleshire.  This false reporting resulted in other lenders refusing to lend Aleshire any monies for other real estate acquisitions or to refinance the current Loans and also caused the interest rates on Aleshire's personal credit cards to be increased despite the fact that Aleshire was current on payments to these credit card companies.

16.     Upon information and belief, reporting a loan as over-the-limit impacts credit scoring or Fair Isaac Corporation ("FICO") scoring by approximately 15-20 FICO points per loan.  Therefore, Defendant's incorrect reporting of all the Loans caused Aleshire's FICO score to drop by about 75-100 FICO points from where it was previously, which was a score of 760.

17.     Further, when Defendant initially acquired the Loans, Defendant charged Aleshire for more than forty (40) days worth of interest on the Loans instead of thirty (30) or thirty-one (31) days.  Therefore, Defendant overcharged Aleshire interest when it first acquired the Loans and in essence was collecting interest in advance.

18.     The Loans also have a fifteen (15) day grace period.  When Defendant acquired the Loans, Defendant changed the grace period to ten (10) days in violation of the

loan agreements.  Therefore, for some time after acquiring the Loans, Defendant charged Aleshire late fees that were not warranted and which were in violation of the loan agreements.

19.      After six (6) months, on or about June 9, 2006, Aleshire met with Frank Vitelli, Senior Vice President of Community Banking for the Defendant (hereinafter "Vitelli") located in its Villa Park location, formerly Villa Park Bank.  Prior to and including the June 9, 2006 meeting, Aleshire described to Vitelli on repeated occasions the above-listed errors by the Defendant. Vitelli indicated all of Defendant's reporting errors would be corrected.  At that same time, Defendant admitted that it had been wrongfully charging Plaintiff a late fee for not paying within 10 days and further acknowledged that its loan agreements with Plaintiff required payment within 15 days as claimed by Plaintiff. Defendant credited Plaintiff for the monies wrongfully charged her for these improper late fees.

20.      But subsequent to the June 9, 2006 meeting with Vitelli, Defendant continued to report Loan A in the amount of $9,999,999, continued to report all of the Loans as over the credit limit, and continued to double report the Loans despite Aleshire's numerous requests that Defendant correct the errors.

21.      The false and erroneous reporting by Defendant caused Aleshire's FICO score to fall to approximately 660 and it has continued to drop since 2006 as a direct result of the conduct of the Defendant.

22.      At that time of June 2006 and ever since Aleshire has been attempting to borrow money for remodeling and acquiring other property.  Additionally, since on or about June 2006 Aleshire has been attempting to refinance the Loans and leave the service of the Defendant.

23.     Aleshire was and still is unable to borrow money and was and still is unable to refinance the loans.  Every time Aleshire has attempted to do so, she was informed that she was reporting over the credit limit on the Loans and that her FICO score was too low.  Thus, other lenders refuse to provide her any financing.

24.     Had Defendant properly reported Plaintiff's loan obligations to the credit reporting agencies, Plaintiff would have been able to obtain other financing.

25.     Due to Defendant's improper reporting of Aleshire's credit to the national consumer credit reporting agencies, Aleshire hired a consulting firm that specializes in repairing improper credit reports.

26.     Said consulting firm was able to correct several mistakes and errors, however, was not able to correct the erroneous credit reportings by Defendant.  Defendant failed to cooperate with the consulting firm and continued to erroneously report Aleshire's credit history on the Loans.

27.     Aleshire's business, which as described herein is heavily reliant on the issuing of credit by lenders, is Aleshire's only means of supporting her family.

28.     Additionally, Aleshire obtained refinancing on the first mortgage of a property commonly known as 402 Willow Road, Winnetka, Illinois, held by Wachovia Mortgage, FSB, f/k/a World Savings. This refinance on the Willow Road property did not involve any additional monies being disbursed to Aleshire but was conditioned on Harris doing nothing other than agreeing to remain in its same lien positions.  Defendant possessed the second and third mortgages on said property, Loans B and C.

29.     At this time, Aleshire was current on Loans B and C.

30.     Defendant refused to subordinate Loans B and C to the tentative new Wachovia loan without Aleshire tendering payment in the amount of two (2) months mortgage payments in advance on both Loans B and C.

31.     As stated above, Loans B and C were already in the second and third positions on the Willow Road property.  Aleshire was current on both Loans B and C, and was not taking out any additional money on the first mortgage.

32.     Aleshire was not able to make the aforementioned lump sum advanced payment to Defendant.  Therefore, Defendant refused to subordinate Loans B and C to the new tentative refinanced first mortgage held by Wachovia, formerly World Savings.

33.     Defendant refused to remain in the exact same lien positions it was already in on this property.  Defendant's secured position would have been exactly the same had it remained with its subordinated Loans B and C to the World Savings first mortgage.

34.     Had Aleshire been able to refinance said first mortgage with Wachovia, formerly World Savings, Aleshire would have saved a total of approximately $2,780 per month on the payment of said first mortgage.

35.     As described above, for over thirty (30) years, Aleshire has been in the business of purchasing and rehabbing real property, selling rehabbed real property, and leasing rehabbed real property.

36.     Defendant's credit reporting errors have indicated to other potential lenders that Aleshire is not creditworthy by reporting the Loans twice even after Aleshire's request to remove them; and by appearing to have an open credit line on Loan A of nearly $18,000,000 more than the maximum provided for in the loan documents of Loan A.

37.     These errors have dropped Aleshire's FICO credit score significantly and have prohibited her from obtaining financing from lenders other than Defendant with which to

conduct her business which is heavily dependent upon the ability to obtain credit to fund purchase of properties and construction.

38.     As a result of Defendant's actions, Aleshire has not been able to conduct her business as she reasonably expected for a period of more than three (3) years now.

39.     As a result of the Defendant's failure to agree to maintain its same secured positions with respects to Loans B and C on the 402 Willow Road property, Aleshire was unable to receive refinancing on the first mortgage, costing her a continued monthly mortgage payment $2,780 higher than the tentative refinanced payment.

40.     On or about August 3, 2009 Aleshire obtained a copy of her consumer credit report which showed that the errors reported by Defendant were still present.

41.     Despite Aleshire's requests and attempts to correct these errors, Defendant refused to do so until approximately August 19, 2009, when the consumer report of Aleshire suddenly omitted these errors.  Yet, due to the length of the continued false reporting, the damage to Aleshire had been done and Defendant's corrective actions were taken too late to reverse this negative financial condition.

42.     As a result of Defendant's egregious actions, Aleshire was no longer able to perform and maintain her longtime business.  Additionally, Aleshire has fallen delinquent on many loans and mortgages secured by real property she owns.  Due to Defendant's actions, Aleshire did not receive any income for a substantial period of time while trying to salvage her business.  As a result, Aleshire had to rely on credit cards to provide for herself and her family.

43.     Aleshire was unable to maintain her status of living and had great difficulty supporting six (6) children, all of which were in college and school during the relevant time period.

44.     In an attempt to support her family and stay current on her outstanding obligations, Aleshire liquidated all securities she owned, liquidated her IRA, and liquidated her pension from her former employment with Sears.

45.     However, as Defendant's improper reporting continued for a substantial period of time, the above funds ran out and Aleshire finally had to rely on credit cards to provide for herself and her family.

46.     Finally, as a result of Defendant's egregious conduct, Aleshire is now the defendant in six (6) separate mortgage foreclosure actions filed in the Circuit Court of Cook County, Illinois, Chancery Division.   These cases are known as case numbers 2008 CH 37919, 2008 CH 40543, 2008 CH 40670, 2009 CH 08927, 2009 CH 08928 and 2009 CH 15460.   Additionally, Aleshire is subject to additional foreclosure actions in another state. She will likely lose title to these properties which include the home in which she resides. Furthermore, Aleshire is no longer current on other obligations, such as her credit cards due solely to the conduct of Defendant as alleged herein and is subject to collection actions against her for these debts.

## COUNT I
### (Negligent Misrepresentation)

1-46.   Aleshire restates and realleges paragraphs 1-46 of the General Factual Allegations as if set forth fully herein as Paragraphs 1-46 of Count I.

47.     Defendants are furnishers of credit information as defined by the Fair Credit Reporting Act (hereinafter the "FCRA").  As being furnishers of credit information under the FCRA, Defendants are bound by its rules.

48.     The FCRA requires that all furnishers of credit information accurately report credit information about consumers to the credit reporting agencies, report the existence of

any dispute about any allegedly delinquent charges, and promptly verify and correct any contested information.

49.     Defendant as a furnisher of credit owed Plaintiff a duty to accurately report her credit information to the credit reporting agencies, report the existence of any dispute about any allegedly delinquent charges, and promptly verify and correct any contested information.

50.     Defendant was negligent in violating requirements of the FCRA in one or more of the following ways:

> a.   Failing to accurately report the credit information of Aleshire to the national credit reporting agencies; and/or
>
> b.   Failing to report a dispute regarding Plaintiff's credit information to the credit reporting agencies; and/or
>
> c.   Failing to promptly verify and correct any contested information regarding Aleshire's credit information with the credit reporting agencies despite its promise through its employee, Vitelli, that her credit information as reported by Defendant would be corrected; and/or
>
> d.   Committing other careless and negligent acts.

51.     Defendant knew of its negligent acts as Aleshire repeatedly requested that Defendant correct its erroneous credit reporting of her loans.  In fact, through its agent and/or employee Vitelli, Defendant agreed that reporting was erroneous and Vitelli agreed to have Defnedant correct the errors.  However, Defendant failed to act in a timely manner and did not correct these reporting errors until on or about August 19, 2009.

52.     As a proximate cause of Defendant's negligent acts, Aleshire has suffered damages by being denied credit, suffering damage to her credit score, being denied the ability to conduct her business and thus earn a living and being forced into default on numerous other financial obligations.  But for Defendant's careless and negligent acts, Aleshire would

not have had a lowered credit score which prevented her from obtaining credit to conduct her real estate business, and would not have been caused to default on most, if not all, of her financial obligations and would not be losing title to her real properties.

53.     The Bank's duty to observe reasonable professional competence exists independently of any contract as the Bank's statutory duty under FCRA required it to accurately report her credit information to the credit reporting agencies, report the existence of any dispute about any alleged delinquent charges, and promptly verify and correct any contested information.

54.     The economic loss doctrine does not bar recovery in tort for the breach of a duty that exists independently of a contract.   *Congregation of the Passion, Holy Cross Province v. Touche Ross & Company*, 159 Ill.2d 137, 164 (Ill. 1994).   In this case, Defendant's duty arose out FCRA and not under a contract with Plaintiff.

55.     Additionally, economic loss is recoverable where one who is in the business of supplying information for the guidance of others in their business transactions makes negligent misrepresentations.  *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill.2d 69, 88-89 (Ill. 1982).  Here, Bank as a furnisher of credit information is in the business of supplying information to the credit reporting agencies for the guidance of others, including other potential lenders to Plaintiff,  in the their business transactions with Plaintiff and clearly made negligent misrepresentations as to Aleshire's credit information.

Wherefore, Plaintiff SUZANNE ALESHIRE prays for judgment in her favor and against Defendant HARRIS, N.A. as follows:

      a.   For an award of Plaintiff's actual damages;

      b.   For Plaintiff's reasonable attorneys' fees and costs of suit; and

      c.   For such other or further relief as this Court deems just and equitable.

## <u>COUNT II</u>
### (Violation of Fair Credit Reporting Act – 15 U.S.C. 1681 *et seq.*)

1-7.    Aleshire restates and realleges paragraphs 1-7 of the General Factual Allegations as if set forth fully herein as Paragraphs 1-7 of Count II.

8.    On May 22, 2009, Aleshire received a letter from Defendant notifying her that she had recently applied for a home loan account with Defendant. (See Defendant's letter dated May 20, 2009, attached hereto as Exhibit "A").

9.    Defendant informed Aleshire that as a result of Aleshire's alleged application and as part of the loan evaluation process for said loan, on May 19, 2009, Defendant requested and obtained her credit score report for Transunion, which is one of the credit reporting agencies authorized to issue such credit score reports.

10.    On or around May 19, 2009, however, Aleshire did not apply for any type of loan with the Defendant. More importantly, around said date Aleshire did not authorize Defendant to request and obtain her credit score report.

11.    The last time Aleshire applied for a loan with Defendant was in Spring of 2006.

12.    The last time that Aleshire met with Defendant's representatives was in July of 2008. At that time, Aleshire authorized Defendant to request and obtain her credit score report, which it did. Aleshire, however, did not apply for home loan around said time nor did she give written consent to Defendant to request and obtain her credit report.

13.    Defendant had no reason to believe that Aleshire at any time provided authorization for her credit report to be requested and obtained.

14.    Under FCRA, 15 U.S.C. 1681b, it is permissible to obtain or use a consumer report only with the consumer's written consent or for a permissible purpose.

15.     Defendant did not have Plaintiff's written consent to access Plaintiff's consumer report.

16.     Defendant lacked a permissible purpose for accessing Plaintiff's consumer report without Plaintiff's consent.

17.     The accessing of Plaintiff's consumer report without consent for the purpose of determining if Plaintiff qualifies for the alleged home loan does not constitute a permissible purpose for Defendant as Plaintiff did not submit an application for such loan at or around May of 2009.

18.     Consequently, Defendants have failed to comply with the requirements of FCRA.

19.     Defendant's noncompliance with FCRA was willful.

Wherefore, Plaintiff SUZANNE ALESHIRE prays for judgment in her favor and against Defendant HARRIS, N.A. as follows:

a.   For an award of Plaintiff's actual and statutory damages;

b.   For Plaintiff's reasonable attorneys' fees and costs of suit; and

c.   For such other or further relief as this Court deems just and equitable.

## COUNT III
### (Defamation Per Se)

1-46.    Aleshire restates and realleges paragraphs 1-46 of the General Factual Allegations as if set forth fully herein as Paragraphs 1-46 of Count III.

47.     Aleshire is and always has been a private individual.  She does not maintain a public persona.

48.     Defendant made statements of a defamatory nature about Aleshire. Specifically, Defendant erroneously reported Aleshire's Loans causing third party lenders to

refuse to lend Aleshire any monies for other real estate acquisitions or refinancing and causing the interests rates on Aleshire's credit cards to increase.

49.     The Plaintiff's credit information as reported to the credit reporting agencies by Defendant was false.  Defendant was made aware of the incorrect reporting yet failed to correct its errors, thus showing knowledge of the false nature of the reporting or reckless disregard for the truthfulness of the reporting.

50.     Each incorrect reporting referred to Aleshire by name and was contained in the credit report issued to other parties by the consumer credit reporting agencies.

51.     Aleshire's credit reports were and are available to the public and were obtained by third parties.

52.     These statements made by Defendant reporting the credit information of Plaintiff were Defamation Per Se.   Under Illinois law, statements that (1) impute the commission of a criminal offense; (2) impute infection with a loathsome communicable disease; (3) impute an inability to perform or want of integrity in the discharge of duties of office or employment; or (4) prejudice a party, or impute lack of ability, in his or her trade, profession or business are considered Per Se Defamation.   *Bryson v. News America Publications, Inc.*, 174 Ill.2d 77, 88 (Ill. 1996).

53.     Aleshire's business revolves around the use of credit in order to obtain loans from third party lenders in order to purchase and remodel properties.  Due to the incorrect credit reporting by Defendant, Aleshire's credit score has severely declined from its rightful score thus rendering her unable to obtain financing from lenders and maintain her business.

54.      Had Defendant property reported Aleshire's Loans, she would have been and would still be able to obtain financing and her business would have continued.

14

55.     When statements are defamatory Per Se, Plaintiff's damages are presumed. *Newell v. Field Enterprises, Inc.*, 91 Ill.App.3d 735 (5th Dist. 1980).

56.     Defendant first reported Aleshire's Loans incorrectly on or about December 5, 2005.  The incorrect reporting by Defendant continued up until at least August 3, 2009. Though the incorrect reporting to the credit reporting agencies began outside of the one year statute of limitations for defamation, each incorrect report constitutes an injury and in the case of repeating injuries the statute of limitations does not begin to run until the date of the last injury.  *Hyon Waste Management Services, Inc. v. City of Chicago*, 214 Ill.App.3d 757, 763 (1st Dist. 1991).  In this case the date of last injury was on or about August 3, 2009.

57.     On August 19, 2009, Plaintiff received a copy of her credit report from one of the credit reporting agencies, Trans Union, that showed that the Defendant was no longer reporting any of the Loans to the credit reporting agencies.  That omission is also incorrect as Plaintiff still has the Loans with Defendant.  So, from December 2005 Defendant double reported Plaintiff's Loans to the credit reporting agencies, and then starting on or about August 19, 2009, Defendant fails to report any of its Loans with Plaintiff to the credit reporting agencies.

Wherefore, Plaintiff SUZANNE ALESHIRE prays for judgment in her favor and against Defendant HARRIS, N.A. as follows:

     a.  For an amount in excess $75,000;

     b.  For Plaintiff's reasonable attorneys' fees and costs of suit; and

     c.  For such other or further relief as this Court deems just and equitable.

## COUNT IV
### (Negligent Infliction of Emotional Distress)

1-55.   Aleshire restates and realleges paragraphs 1-55 of Count I as if set forth fully herein as Paragraphs 1-55 of Count IV

56.   On or about December 5, 2005 and continuing until on or about August 3, 2009, Defendant incorrectly and negligently misrepresented Aleshire's Loans to national credit reporting agencies.  Though Aleshire had notified Defendant of their error, they failed to correct the reporting.  As a result of their negligent acts, Aleshire could not maintain her business and therefore could not support her family.

57.   Defendant first reported Aleshire's Loans incorrectly after December 5, 2005.  However, the incorrect reporting continued up until at least August 3, 2009.  Though the reports began outside of the two year statute of limitations for negligent infliction of emotional distress, each incorrect report constitutes an injury and in the case of repeating injuries the statute of limitations does not begin to run until the date of the last injury.  *Hyon Waste Management Services, Inc. v. City of Chicago*, 214 Ill.App.3d 757, 763 (1st Dist. 1991).

58.   As a direct and proximate result of the aforementioned negligent misrepresentations by Defendant, Aleshire has suffered, and has continued to suffer, severe emotional distress.

Wherefore, Plaintiff SUZANNE ALESHIRE prays for judgment in her favor and against Defendant HARRIS, N.A. as follows:

     a.   For an amount in excess $75,000;

     b.   For Plaintiff's reasonable attorneys' fees and costs of suit; and

     c.   For such other or further relief as this Court deems just and equitable.

Respectfully submitted,

PLAINTIFF SUZANNE ALESHIRE


/s/ Mark D. Belongia
One of Her Attorneys



Mark D. Belongia, #6269391
mbelongia@belongialaw.com
Sulejman F. Dizdarevic, #6289377
sdizdarevic@belongialaw.com
Belongia, Shapiro & Hynes, LLP
20 South Clark Street, Suite 300
Chicago, Illinois  60603
Tel (312) 662-1030
Fax (312) 662-1040

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SUZANNE ALESHIRE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 08 CV 7367 |
| v. | ) | |
| | ) | Judge St. Eve |
| HARRIS, N.A., | ) | |
| | ) | |
| Defendant. | ) | |

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on the 20th day of January, 2010, a copy of the foregoing Second Amended Complaint was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system which sent notification to the following:

Dianne E. Rist – rist@chapman.com
S. Todd Sipe – sipe@chapman.com
Chapman and Cutler, LLP
111 West Monroe Street
Chicago, Illinois 60603


Sulejman F. Dizdarevics - sdizdarevic@belongialaw.com
Belongia, Shapiro & Hynes, LLP
20 South Clark Street, Suite 300
Chicago, Illinois 60603


                                        _/s/ Mark D. Belongia_____
                                        Mark D. Belongia

Mark D. Belongia, Atty # 6269391
mbelongia@belongialaw.com
Sulejman F. Dizdarevics, Atty #6289377
sdizdarevic@belongialaw.com
Belongia, Shapiro & Hynes, LLP
20 South Clark Street, Suite 300
Chicago, Illinois 60603
P:  312.662.1030
F:  312.662.1040